# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| Aaron Mitchell, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 7:18-cv-01825-LSC |
| ) | |
| City of Northport and ) | |
| Bart Marshall, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF OPINION**

Aaron Mitchell is an African-American firefighter. He sued the City of Northport, Alabama, for race discrimination and retaliation under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (Doc. 17.) He also sued Northport's Fire Chief, Bart Marshall, under § 1981.[1] (*Id.*) The parties' cross-motions for summary judgment are before the Court. (Docs. 56 and 64.) Defendants' motion for summary judgment (Doc. 56) is due to be granted, and Mitchell's motion for partial summary judgment (Doc. 64) is due to be denied.

---

[1] This case originally had eight plaintiffs and many more claims. (Doc. 17.) In July 2019, this Court dismissed every plaintiff except for Mitchell and every claim except for these. (Docs. 31 and 32.)

### I. Standard of Review

A successful motion for summary judgment shows there is no genuine dispute as to any material fact and that the movant deserves judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2009)).

At the summary judgment stage, trial courts do not weigh evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We instead view all evidence and draw all justifiable inferences in the non-moving party's favor. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). Then we determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### II. Background

The Northport Fire Department hired Mitchell in March 2006. (Doc. 58–1 at 37–38.) Three different superiors reprimanded or disciplined him within his first two years. In June 2006, then-Chief Darryl Patterson disciplined him for being out of

uniform while on duty. (Doc. 58-1 at 78; Doc. 59-1 at 21.) On December 13, 2007, Captain Michael Carter verbally reprimanded him for tardiness. (Doc. 58-1 at 87–88; Doc. 59-1 at 23.) Lieutenant Roger Potter again reprimanded him for tardiness just two weeks later. (Doc. 58-1 at 90; Doc. 59-1 at 24.)

Mitchell was again suspended in 2014. On May 19, 2014, several Northport firefighters demonstrated fire safety and fire extinguisher safety on a local television station. (Doc. 58-1 at 113–25.) While at work and while watching the demonstration, Mitchell posted to Facebook: "Them dumb ass on the news this morning, talking about fire extinguisher. Only if the people knew."[2] (*Id.*) He admits "them dumb ass" meant his colleagues on the broadcast. (*Id.*) Battalion Chief Ricky Wilkinson told him to immediately remove the post. (Doc. 57 at 17.) When Mitchell refused, Wilkinson suspended him *with* pay. (Doc. 59-1 at 31.)

Mitchell appealed the 2014 suspension to Northport City Administrator Scott Collins. (Doc. 58-1 at 131.) After a disciplinary hearing, Collins adjusted the suspension—this time to a suspension *without* pay—and wrote the following:

> [Mitchell] stated that he could post anything he wants on his Facebook page and he is free to say whatever he wants to . . . . Not only was the comment posting unacceptable but posting the comments while on duty is unacceptable and his refusal to immediately remove the contents constitutes insubordination.

---

[2] This was not Mitchell's first troublesome posting on social media. Just two weeks earlier, the United States Secret Service interviewed him for posting that a presidential candidate should "go kill [himself or herself] slowly." (*Id.* at 141.)

(Doc. 59-1 at 34.)

Soon after posting the "them dumb ass" comment, Mitchell texted Chief Marshall that, without informing the Department, he had taken paramedic classes, had earned a paramedic license, and that he wanted the pay increase offered to some paramedic-certified firefighters. (*Id.*; Doc. 58-1 at 183–218.) Marshall responded:

> **Marshall:** No one knew [you were in paramedic school]? How were we to plan to fund [the pay increase]? Why the secret?
>
> **Mitchell:** Well I didn't see . . . a reason to tell since anything I say get[s] twisted . . . .
>
> **Marshall:** Not sure I understand[.] If you expect to get compensated we should know.
>
> **Mitchell:** Okay understand that I can say I drop[ped] the ball on my end. But I personally didn't feel like it was anybody['s] concern since I was paying for it and I did it off shift.
>
> **Marshall:** Don't understand the secrecy or the lack of courtesy if [you're] requesting compensation. That is [the] only concern. We have procedures in place for that.

(Doc. 59-1 at 42–50.) Still believing he deserved an automatic pay increase, he appealed to City Administrator Collins. (Doc. 58-1 at 201-05.) Collins, like Marshall, told Mitchell the paramedic pay bump isn't automatic. (*Id.* at 203.) The City has a budgeting process, and, because Mitchell earned his license in secret, the City never budgeted a pay increase. (*Id.*)

Mitchell referenced the suspension and Marshall's unwillingness to promise him an unbudgeted pay increase in an October 2014 EEOC filing. (Doc. 59-1 at 36.) He claimed that both the suspension and the pay/paramedic incidents were racially motivated. (*Id.*)

Three years after that 2014 EEOC filing, the Department again suspended Mitchell, this time for threatening colleagues and destroying property. Mitchell's station used a "house funds" system. (Doc. 58-1 at 231.) "That means [firefighters] gave their own money to buy condiments for the fire station so [they could] eat and have coffee, peanut butter, just staples for" the station. (*Id.*) On November 3, 2017, Mitchell couldn't find his shift's coffee can. (*Id.* at 232–33.) He searched the station, saw the missing coffee in another shift's locked cabinet, found a pair of bolt cutters, cut the cabinet's lock, and he took back the allegedly-stolen coffee can. (*Id.* at 238–42.) Two days later, firefighter Todd Payne approached Mitchell and asked if he cut the lock. (*Id.* at 248.) And matters spiraled out of control when Mitchell admitted to it. (*Id.* at 247–50.) Payne demanded Mitchell reimburse him $17 for the lock; Mitchell threatened to give Payne "a $17 ass whooping." (*Id.* at 256.) Payne warned Mitchell that he'd told Chief Marshall about the cut lock; Mitchell accused Payne of "running and telling his daddy." (*Id.* at 251.) Mitchell also told Payne to "quit acting

like a pussy" and to "quit acting like a little bitch." (*Id.* at 252.) The Department investigated and suspended Mitchell for two days without pay. (Doc. 57 at 29.)

Battalion Chief Pate issued several findings in a written suspension report. (*Id.* at 28–29.) First, he found Mitchell "deliberately damaged and/or destroyed another employee's personal property." (*Id.*) Second, he found "Mitchell used vulgarities and/or profanity multiple times inside and outside the station." (*Id.*) And third, he found Mitchell "threatened bodily harm" to other firefighters. (*Id.*) Pate said these findings justified Mitchell's suspension. (*Id.*)

Mitchell appealed the 2017 suspension to the City Administrator, claiming unfairness. (Doc. 58-1 at 333, 336.) During the lock-cutting argument, firefighter Cameron Shipley (Caucasian) had allegedly asked Mitchell, "What if we go out there and bust the windows out of your car, would we be wrong for that?" (*Id.* at 273.) According to Mitchell, Shipley's question was threatening, and it wasn't fair to punish his threats without also punishing Shipley's. The City Administrator rejected Mitchell's fairness argument and upheld the suspension. (*Id.* at 342–343.)

Mitchell sought two promotions after his 2017 suspension. He applied to become a sergeant, but he failed the required examination. (*Id.* at 367–71.) (*Id.* at 370–71.) And, around October 10, 2018, he tried to apply for a lieutenant position, but Chief Marshall didn't allow him to sit for the lieutenant exam. (*Id.* at 373–77.)

Mitchell believes the November 2017 suspension cost him the promotion. (Doc. 64 at 5.)

## III. Defendants' Motion for Summary Judgment

### A. Mitchell's Race-Discrimination Claims Cannot Survive Summary Judgment.

Mitchell's complaint is unorganized and difficult to follow, and his brief adds little clarity. But after reviewing the complaint, the briefs, and this Court's July 2019 Memorandum of Opinion, the Court believes Mitchell relies exclusively on his November 2017 suspension. He contends that race motivated that suspension. (Doc. 17 at 2–3.)

Race claims under Title VII and § 1981 are analyzed in the same manner. *Hill v. Emory Univ.*, 346 F. App'x 390, 393 (11th Cir. 2009) (citing *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000)). For both, the claimant must show his or her employer acted with discriminatory intent. *See Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (through direct or circumstantial evidence, Title VII claims "require proof of discriminatory intent"); *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (successful § 1981 claims show "that the defendant intended to discriminate on the basis of race").

When, like here, a claim relies only on circumstantial evidence, the plaintiff can show discriminatory intent through *McDonnell Douglas*'s burden-shifting

framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973). "The first step of the *McDonnell Douglas* framework requires the plaintiff to make out a case sufficient to withstand a motion for summary judgment—i.e. a prima facie case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011). The burden then shifts to the defendant to produce a legitimate, nondiscriminatory explanation for the alleged wrongdoing. *Texas Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). Should the defendant produce that legitimate explanation, the plaintiff must show by a preponderance of evidence that the proffered explanation was a pretext for discrimination. *Id.* at 253.

Mitchell's claim fails under the *McDonnell Douglas*'s first step. A prima facie case of race discrimination has four elements. *Rice-Lamar*, 232 F.3d at 842–43 (citing *Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997). The plaintiff must show (1) he is a member of a protected class, (2) he was subjected to adverse employment action, (3) his employer treated similarly situated employees who are not members of the plaintiff's class more favorably, and (4) he was qualified for the job or job benefit at issue. *Id.* Here, Defendants challenge only the similarly situated comparator element. (Doc. 57 at 35–38.) A similarly situated comparator is similar in all material respects. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019). He "will have engaged in the same basic conduct (or misconduct) as the

plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. Mitchell's response brief points to one comparator: Cameron Shipley—the firefighter who asked, "What if we go out there and bust the windows out of your car, would we be wrong for that?" (Doc. 58-1 at 273.) Even if Shipley asked that question, he and Mitchell were not similarly situated for two reasons. First, they did not engage in the same basic conduct. Shipley asked a question; Mitchell destroyed property, cursed, and threatened to fight colleagues. Second, they did not share the same disciplinary history. Superiors reprimanded and disciplined Mitchell multiple times before his November 2017 suspension—in 2006, in 2007, in 2014. Nothing suggests Shipley had a similar pattern of misconduct.

Even if Mitchell established a prima facie case (which he didn't), Defendants' proffered a nondiscriminatory explanation for the November 2017 suspension. (Doc. 57 at 39–41.) They suspended Mitchell because he threatened colleagues, called colleagues "pussies," and accused a colleague of "acting like a little bitch." (*Id.*) These nondiscriminatory explanations satisfy Defendants' burden under the second *McDonnell Douglas* step. *Cf. Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (quoting *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) ("At this stage of the inquiry, the defendant need not persuade the court that its proffered

reasons are legitimate; the defendant's burden is merely one of production, not persuasion.").

Mitchell's claim also fails under the third step of *McDonnell Douglas*. Once an employer offers legitimate reasons for alleged wrongdoing, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). A plaintiff shows pretext "either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). "If the [employer's] proffered reason is one that might motivate a reasonable employer, [an employee] . . . must meet it head on and rebut it" by "producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). Mitchell did not produce sufficient evidence to rebut Defendants' proffered explanation.

Mitchell makes two pretext arguments. First, he says "the record reflects that other employees of a different racial background did not have to face any negative consequences for violating the same code of conduct that Plaintiff allegedly violated." (Doc. 74 at 2.) He never names those other employees, and he never

names the codes of conduct they allegedly violated. (*Id.*) Second, he says "other minority employees have filed complaints against Defendant Marshall for discrimination." (*Id.*) Beyond these two arguments—neither of which include a citation to the record—Mitchell's brief offers nothing. (*Id.*)

Both pretext arguments fall short. True enough, a plaintiff can use similarly situated comparators to show pretext. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (court looked to similarly situated comparators while weighing a plaintiff's pretext argument); *see also Lewis*, 918 F.3d at 1223 n. 9 (comparator evidence is relevant both at the prima facie stage and at the pretext stage). But comparator evidence is different than what Mitchell's first argument offers: a conclusory statement, with no citation, saying the Department treated other employees differently. (Doc. 74 at 2.) Saying unnamed comparators violated unnamed policies neither persuades the Court nor shows that Defendants' proffered explanation is unworthy of credence.[3] "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young v. Gen. Foods Corp.*, 840 F.2d 825,

---

[3] Assuming the unnamed comparator is Cameron Shipley, the Court already explained he and Mitchell are not similarly situated in all material respects.

830 (11th Cir. 1988). His second argument—that "several other minority employees have filed complaints against Defendant Marshall for discrimination"—is also insufficient. (Doc. 74 at 2.) Mitchell neither names those other employees nor explains why their complaints undercut Defendants' nondiscriminatory explanation for suspending him in November 2017. (*Id.*)

Mitchell destroyed a colleague's property. He cursed and threatened that colleague. As punishment, Defendants suspended him. Because he never established a prima facie case suggesting this punishment was race discrimination, and because he never rebutted Defendants' nondiscriminatory explanations, summary judgment is due to be granted, and his claims of race discrimination against the City of Northport and Chief Marshall are due to be dismissed.

### B. Mitchell's Retaliation Claim Cannot Survive Summary Judgment.

Mitchell's retaliation claim also rests on the November 2017 suspension.[4] (*See* Doc. 74.) He says Defendants suspended him because he filed an EEOC complaint in 2014. (*Id.* at 3.) For this, the Court once again turns to *McDonnell Douglas* and its burden shifting. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).

---

[4] The November 2017 suspension is the only retaliatory action referenced in Mitchell's response brief. (Doc. 74 at 3.) If his retaliation claim relies on unmentioned incidents, he abandoned those arguments by not including them. *Resol. Tr. Corp. v. Dumnar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). District courts "are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Correcs.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

His claim again fails under *McDonnell Douglas*'s first step. A prima facie retaliation case shows (1) the plaintiff engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009)). Mitchell's October 2014 EEOC filing was statutorily protected activity. *Allen v. U.S. Postmaster Gen.*, 158 F. App'x 240, 244 (11th Cir. 2005). And his November 2017 suspension without pay was an adverse employment action. *Cf. Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (conduct that "alters the employee's compensation" is an adverse employment action). However, no evidence links the protected conduct to the adverse action. Too much time (three years) separates the filing and the suspension for temporal proximity to, on its own, show causal linkage. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2020) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."); *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (just three and one-half months between protected conduct and adverse action is insufficient temporal proximity to create a jury issue on causation). Plaintiff's only other argument—that "other employees who belong to

minority groups were treated unfavorably after lodging EEOC complaints" (Doc. 74 at 3)—is also insufficient. Saying unnamed employees "were treated unfavorably" in no way links *Mitchell*'s 2014 EEOC filing to *Mitchell*'s 2017 suspension. With no evidence linking the two, Mitchell did not establish a prima facie case. *See Adams v. Cobb Cnty. Sch. Dist.*, 242 F. App'x 616, 621 (11th Cir. 2007) (conclusory assertions do not satisfy the causal link element).

Even if Mitchell had established a prima facie case, Defendants again offered nondiscriminatory explanations for suspending him: he threatened a colleague, he cursed a colleague, and he destroyed a colleague's property. (Doc. 57 at 46.) Because Mitchell offered no new evidence or arguments suggesting these explanations are pretext for retaliation, summary judgment is due to be granted.

### IV. Mitchell's Motion for Partial Summary Judgment

With a five-page brief, Mitchell moved for summary judgment on his Title VII and § 1981 claims. (Doc. 64.) For the reasons explained above, Mitchell's motion is due to be denied.

### V. Conclusion

Because no reasonable jury could find in Mitchell's favor, Defendants' motion for summary judgment (Doc. 56) is due to be **GRANTED**. Mitchell's motion for partial summary judgment (Doc. 64) is due to be **DENIED**. This case is due to be

**DISMISSED WITH PREJUDICE**. The Court will enter an Order consistent with this Memorandum of Opinion.

    **DONE** and **ORDERED** on November 23, 2020.

_____<br>
L. Scott Coogler<br>
United States District Judge<br>
<span style="font-size:small">203323</span>